Curia, per
Butler, J.
The questions which have been sent up to this court for its adjudication, are these:— 1st. Was the defendant, as the surety of an administra-trix, properly allowed to impugn the decree against his principal, so far as to permit him to introduce evidence to shew that the administratrix had been charged with a larger number of working hands than she had the control of in her fiduciary capacity. 2d. What should be the eifect of the order of revocation, made by Wm. M. Hutson, on the 1st of December, 1828 ? Did it relieve the sureties on the bond, from their liability to answer for the two negroes that were then in her husband’s possession, and which were subsequently taken away and disposed of by the husband 1
1. I had supposed, until it was again brought in discussion in this case, that this question had been decided by the principle which runs through and sustains the judgment of the Ordinary vs. Condy, 2 Hill, 313. The reasoning of the learned judge, who delivered that judgment, has no reference to the precise limitations that had been attempted to be imposed on the principle, by some of the previously adjudicated cases. It sets forth in strong relief, this proposition — that a surety is not to be prejudiced by a decree against his principal, to which he was not a party — except so far as the decree is to be regarded as prima facie evidence against him. By such decree, he cannot make such defence, as perhaps he might have done, if he had been originally sued with the principal ; he cannot require the account to be made out against him ab ini-tio, but will be restricted to the more disadvantageous position of proving errors to an account already settled. The true and just principle for the adjudication is, that no one should be condemned without an opportunity of being heard. It seems to be a startling proposition, to say that a surety shall be condemned by collusive or negligent admissions of his principal, or by an arbitrary deci *513 sion against him; and that, too, under such circumstances, sometimes, as to render the principal indifferent to the result, or prepared to acquiesce in it; a result that might have been very different if it had been attained under the suggestions of a vigilant and interested surety. Suppose this case : A widow with children administers on her husband’s, estate ; she marries an imprudent and prodigal person, who wastes the property — -the husband and wife are cited before the Ordinary, and an account is taken against them for a larger amount of property (stated on the face of the report, to have belonged to the intestate) than they ever had in their possession. Shall the surety be so far fixed by such account, as to be deprived of an opportunity to shew, that the account could be greatly reduced by credits which he has it in his power to prove by witnesses, and which had been wilfully or negligently withheld? or to shew that the principal has been charged with 20 working hands, when in fact they were children, sucking at the breast, or that there were no such hands at all ? A surety might enter into an obligation, as in the case of bail, to abide by the judgment, whatever it might be, against the principal. But it does not appear to me that the administration bond contains any such stipulations, either express or implied. All the adjudications which recognize the decree against the administrator as only prima facie evidence, and therefore allow the decree to be impugned for some purposes, forbid this construction. To sustain such a construction, the decree against the principal should be held conclusive, according to the terms of the original obligation. For it would seem that the surety must not only have no control over the principal.in the administration, but must be entirely passive in submitting to the result of every proceeding against him. This is not only to be bound for his acts and doings, but by-his admissions, and by the opinion formed, without an opportunity of explanation. Judge Nott does not base his judgment on any such view, when he ruled that the surety was conclusively fixed by the decree against his principal. In the case of the Ordinary vs. Robinson, 1 Bail. 25, that distinguished judge did hold, that in no case could the surety *514 examine into the decree against the administrator, upon the ground that the court of law had no jurisdiction in matters of account, and that, therefore, whenever the decree of the Ordinary had settled the accounts of the administrator, it was conclusive on all the parties to the bond. This decision stands alone, and is not reconcilable with the previous decisions of the Ordinary vs. Caldwell, 3 M‘C, 225, and Shelton ads. Cureton, 3 M‘C. 412; it is opposed to the decision in the subsequent case of Joyner vs. Cooper, 2 Bail. 199 ; and it may be said to be entirely repudiated by the case of the Ordinary vs. Condy. For in all these cases, the amount of damages against the surety was allowed to be reduced, by his shewing, from an examination of the accounts, that individual demands had been charged against the principal, which should be deducted in the verdict against the surety. This decision of Judge Nott stands between the preceding decisions referred to and several subsequent adjudications on the same subject; and being 'inconsistent with them, should yield to their authority — especially in all the points in which they concur. In the case of the Ordinary vs. Caldwell, Judge Coleock, after stating the legal obligation of the bond, remarks that the surety “ did not contest the legality of the decree, nor allege that it was obtained by fraud ; nor did he contend that he could, in any manner, shew the amount decreed was not due— or that he had a right to do so.” Not having done so, the court held that the decree should be regarded as prima fa-cie evidence, to fix the liability of the surety. Here, Judge Colcock does not say but that he would, upon proper proof, have allowed the surety to reduce the amount of the verdict against him, by shewing that the decree contained demands that should not have been charged. On the contrary, his remarks would suggest the belief, that he would give the surety an opportunity to be heard in defence of his own interest, in the contestation of a decree that had been given against him, either by fraud, or that was in any other wise prejudicial to his rights. In the case of Shelton ads. Cureton, the same Judge says that the judgment against the principal may be looked into by the sureties, to shew that it was not rendered for those acts for which they became responsible. And in pursuance of this view, it *515 was held that the sureties were not bound to answer for individual demands against the administrator, and which had been included in the decree against him. This would seem to restrict the liability of the surety to such matters as were under the control and direction of the administrator, in his representative character. In the case of Joyner vs. Cooper, Judge O’Neall assumes the law to be, that the surety to the bond of an administrator, guardian or committee, may look into a decree against his principal, in order to see that he is only charged with the accounts and duties, the performance of which the surety has undertaken to guarantee. That is, he may look into the decree, to limit his liability to official acts. For this purpose, he may introduce evidence to shew what acts are, and what are not, official. This, it seems to me, on principle, opens the door to the surety, to enable him to limit the decree to the just and legal demands against the administrator ; not, perhaps, to impugn the principles by which the accounts of proper items were made up, but to enumerate the items and give them their true character. The question here suggests itself, upon what principle is it, that the surety has a right to look into the decree at all % Why, upon no other than this — that he was not privy to the former judgment, and as a stranger, claims the right to be heard, for the purpose of ascertaining his just and legal liability. And if he is once let in for one purpose, how can the principle be restricted 1 Upon general principles of law, he should have an opportunity for plenary redress, or none at all. Chancellor Harper, in giving the surety the benefit of the principle, never thought of hemming him in by arbitrary limitations of it. I shall not attempt to add reasons to his able, and in the opinion of a majority of the court, satisfactory judgment. The great difficulty which he seems to have felt, was whether the judgment against the principal was any evidence at all against the surety; and on this point, he seems to have acquiesced in the convenient practice that had been previously adopted; to wit: that it should be only prima facie evidence, subject to be controlled and changed by any proof that the surety could produce, to shew that as to himself, he should be held chargeable only for the true *516 amount due by the administrator. Beyond this, the previous cases do not seem to have received his approbation.
The case of the Ordinary vs. Blakeney, Dud. 27, was avowedly decided in conformity with the principles laid down in the case of Condy. The circuit Judge decided that the defendant might surcharge the credits of the ad-ministratrix, by shewing that she had disbursed money not allowed by the decree, and might falsify any debts against her. And under this judgment, the surety greatly reduced the amount of the verdict against him, by shewing that the administratrix was entitled to many credits which she did not think proper to avail herself of before the Ordinary, and demands were charged against her that were not due. This part of the Judge’s circuit opinion was not appealed from, but was acquiesced in, under the weight of authority and a sense of its palpable justice. This case presented an instance where there was reason to apprehend that the facile mother, being insolvent, was willing to submit to any decree against her, as the amount of it would go to her children, who were the distributees of her husband’s estate. The justice of this view may be thus illustrated — suppose a surety could shew that a decree had been obtained in the absence of his principal, for a large amount, and that he had a receipt in fulL Sliould. not the surety have the benefit of the evidence to exhon-erate himself from liability 1 Would it be a sufficient answer to say to him, you are bound by the accounts, as they •have been settled by the Ordinary. And if a receipt in full could be thus used, why not a receipt for half, or a third ? or to make the instance more like the one before us, suppose the administrator to have been charged for the value of a negro that had died, or for one that never had existed. If the surety should have no opportunity to contest these matters, then he would occupy the place of an insurer, for the benefit of the distributees. They would get what the administrator never had, or that which had been lost in his hands, without blame on his part. Or they might have, in another view, awarded to them what the principal had already accounted for. All of which would be obviously against right, and in derogation of the com *517 mon principle, that every one should be heard before he is condemed. I can see no difference between demands charged against the administrator, of a private nature, and such as never had any existence. One negro is struck out of an account, because he belonged to the administrator himself, whilst another, who had no existence, is allowed to remain, because he is charged as belonging to the intestate.
The 2d question before us is not free of difficulty. The right of the Ordinary to revoke letters of administration, as well as to grant relief to sureties against future liability, has not been seriously questioned. The words of the Legislature are that “ if securities for administrations conceive themselves in danger of being injured by such secu-rityship, they may petition the court to whom they stand bound, for relief; which court shall summon the administrator to appear, and thereupon make such order or decree, as shall be sufficient to give relief to the petitioner.” (5 Stat. 111. * ) The power thus conferred is a very extensive one, involving a wide discretion as to the cases in which it should be exercised, and the conditions which may be annexed. It would seem to me, that in no case should the Ordinary grant an order to discharge the sureties on one bond, without requiring, as a condition, that others should be substituted. Justice to unrepresented distribu-tees or. creditors would seem to require it, and I believe that such has generally been the practice ; either by granting a new power to another person, or to the same administrator with other sureties. It does not, however, seem to have been done in this case, and the sureties may have reposed with too much confidence, under the false impression that they had been released from all liability under their bond, in reference to the property then in the hands of the administratrix. We are to inquire here, not as to the propriety of its exercise, but the effect of the order made by the Ordinary. Since the decisions of Shelton ads. Cureton, Trimmier vs. Trail, 2 Bail. 480, and the Ordinary vs. Bigham & Hudson, 2 Hill, 512, the doctrine is well set- *518 tied, that in no case can the Ordinary, in the exercise of any power conferred on him, discharge and release the sureties from such liability as attached to them at the time of the revocation of the administration.
The order which we have under consideration cannot operate beyond its terms; which only release the suieties from future liabilities, and cannot affect those that were incurred at the time. Now we must inquire what was the undertaldng of the administratrix under her bond, in relation to the property that had been committed into her custody, and which has not been delivered to any one entitled to receive it. According to the tenor of the bond, (5 Stat. 110) an administrator is to take a true account, (fee ; exhibit the same when required; the said goods and chattels he shall well and truly administer according to law, (fee; and all the rest of the said goods, chattels and credits, which shall be found remaining upon the account of the administration, he shall deliver and pay over' to such persons, respectively, as are entitled to the same by law; and in case of a will being discovered, shall surrender such administration, (fee. Under these terms, the administrator is made an official bailee, to keep and account for the goods and chattels committed to his charge. Until the legal claimant applies for the goods, the liability of the administrator to account for them, and which must, of course, extend to his sureties, continues. This liability must attach only to such goods as were received in colore officii, and during the existence of the trust, but cannot be extended to such assets as may come into such a person’s hands after the termination of his authority. At the time her authority was revoked by the Ordinary, the adminis-tratrix had in her hands negroes and other property which she had received of the estate of her intestate, in her representative character. It will not do to say, that after that time she could defeat the rights of the distributees, because her fiduciary character no longer continued. All that she had received and then held, must be referable to her representative title, and she could not be divested of her liability to keep it without waste, until she had delivered it up according to law, to the legal claimant, whoever *519 that might be. It would be most dangerous to hold that revocation would immediately operate to discharge sureties from their liability, for waste committed or property held by the administrator at the time of such order. If so, there would be no security against wanton destruction or dishonest conversion. For, between the time of revocation and the appointment of another administrator, however short, irremediable mischief' might be done. As in this case — the wife being insolvent, the husband alike indifferent to the interest of the distributees and sureties, abandons her and takes off all the administration property, without leaving any one responsible for it. To guard against such consequences, it is safest to hold the sureties liable for all the property received and not accounted for. The difference between them and distributees, is this — they had it in their power to prevent mischief, whilst the distri-butees, not being acquainted with the proceeding, or being minors, were not in a condition to take care of their rights. There are occasions when those who are present should, in justice, take care of the interest of the absent. And the most effectual way to make them do their duty, is to identify it with their interest. Upon the revocation of the letters of their principal, the sureties should have taken out letters themselves, or procured administration to be granted to another. Not having done so, they must abide the liability which their principal had already incurred, and which she could not free herself from, without complying with the requisitions of her bond, to wit — either to keep it safely herself, or deliver it into the custody of one duly authorized to take charge of it. It is unnecessary to look beyond the precise question which we have before us. If the administratrix had died, instead of having her authority terminated by the revocation of her letters, or other sureties had been appointed for her, in place of those who were discharged, what liability would have attached, in such instances, it is unnecessary to determine. The principle of this judgment, modified by circumstances, might be applied without much difficulty.
Under the view which a majority of us have taken, the plaintiff was entitled to recover from the defendant thq *520 value of the two negroes that were in the possession of the administratrix at the time of the revocation, and which were subsequently taken away by Rush, her husband. They were committed to her custody under her representative title ; but as to the hire of the negroes after her authority was terminated, it cannot be referred to any such right. That stands as though money had been paid to the admin-istratrix, after her letters had been revoked, and must be regarded in the nature of a wrongful payment, so far as the sureties are concerned. She was bound to take. care of what had been legally received, but was not officially bound to make profits, or account for them. Her individual liability may, nevertheless, have continued; and, in a court of equity, it is probable she would have been required to pay interest, or account for profits, if she had made them.
To carry out the views here expressed, a majority of the Court of Errors think a new trial should be granted.
As it respects the other questions reserved by the Court of Law, that court concurs with the circuit judge.
Secondary evidence, such as that which was offered,— a written and exact copy of. the original, — was properly admitted to supply the loss of the original order of revocation.
JohksoN, Harper and Johnston, CC. and Frost, J. concurred.
O’Neall, J.
In this case I agree that the evidence by which the Ordinary’s discharge was established, was competent. The fact of the loss of such a paper, was prima facie established by proof of search for it in the proper office, and that it could not be found; then proof of its existence and contents was proper as secondary evidence. Mr, Riley proved its existence, and shewed its contents, by the copy which he verified as true. The question which next arises, is, what effect that discharge should have*? The Act of 1789 clearly gives the Ordinary the power, on the application of sureties to an administration bond, to make “§uch order or decree as shall be sufficient to give relief.” In DeLane's case, 2 Brev. Rep. 167, the Or *521 dinary, on the application of one of the sureties, revoked the letters of administration, and the court held it was a proper mode of giving the relief authorized by the Act of 1789. So that the revocation of the letters of administration of Sarah Daley, then Rush, by Ordinary Hutson, must be considered as a legal exercise of the authority vested in him by law. How far does it discharge her sureties 1 In Trimmier vs. Trail, it was held that a discharge by the Ordinary of the sureties to an administration bond, could only operate to discharge them from a future, not a past, liability. The idea is, perhaps, better expressed in the Ordinary vs. Bigham & Hudson, in which it is said that the Ordinary cannot “ discharge from an incurred liability.” These cases followed Shelton ads. Cureton, in which Judge Colcock said, and ruled, that “the discharge could not affect existing liabilities.”
The principle of these cases is correct, beyond all doubt, and is conceded here. The difficulty is, it is said, in its application to this case. After the revocation of the widow’s letters, no administration de bonis non was committed to any one for many years; nor was the distributee of legal age to receive the property; the husband of the ad-ministratrix, after the revocation, carried off two of the negroes, and she is charged with their price in the decree of the court of equity, and with the hire of all the negroes, both before and after the revocation. By the Act of 1789, the form of the administration bond is given, and by it the administratrix and her sureties covenanted, 1st. To make a true and perfect inventory of the goods, chattels and credits of the deceased, in. the hands of the adminis-tratrix. 2d. That she would well and truly administer such goods, chattels and credits, according to law. 3d. To make a true account of her actings and doings, when required by the court of Ordinary, and all the rest of said goods, chattels and credits, which shall be found remaining upon the account of the said administration, the same being first allowed by the Court of Ordinary, shall deliver and pay unto such persons, respectively, as are entitled to the same by law. These are the undertakings of the defendant, and constitute, therefore, his obligations and lia *522 bilities. The administratrix received the property and inventoried it. She had the possession to the revocation, and in that time married. At the revocation, she had not fully administered the goods; the negroes remained. What was she to do with them 'l She and her sureties were bound to deliver them to such persons as by law were, respectively, entitled to them. This was an incurred liability at the revocation. The plaintiff, as one of the dis-tributees, would, if sui juris, have been entitled to two-thirds ; but on John Daley taking out letters of administration de bonis non, he was entitled to have all the negroes delivered to him ; and of them, in the case against him and the administrator of Sarah, the complainant has established his right as distributee to recover the value. Neither Sarah Daley, now Rush, nor her sureties, can deliver the slaves. They have been carried away by her husband. Is this any answer to the claim? Certainly not. For the obligation of the defendant can only be discharged by shewing that his principal, when the letters of administration were revoked, was not, by law, liable for the slaves. This cannot be done. For if at the very moment when the administration was revoked, administration de bonis non had been granted, and the negroes had not been delivered, on demand, to the administrator, she and her sureties would have been liable for their value. '.She and they are equally so, on the grant of administration de bonis non, to the administrator de bonis non who administered, when the distributee attained full age. For when he puts his finger on the contract, and claims the delivery of the unadministered slaves, nothing short of a legal delivery of them can discharge the contract. If she had died, (and the revocation can have no greater effect than her death,) the result would have been identically the same. For her administrator, and her sureties, must have accounted for all the goods, chattels and credits which were of the deceased in her hands, and which remained after her accounts had been legally adjusted in the Court of Ordinary, or in the Court of Equity, exercising the same jurisdiction. In both cases, the revocation and death, it was the business of the sureties to protect *523 the estate and themselves from loss, by taking out administration de bonis non. I, therefore, think the circuit judge erred in excluding from the recovery the price of the negroes eloigned after revocation ; and I should be disposed to say, that interest on their value, from the revocation to the present time, should be allowed, was it not that there was no one to whom they could have been legally delivered, until the grant of administration. The case of Davis vs. Wright, 2 Hill, 560, ruled that under such circumstances, interest was not recoverable. To the value of the negroes should be added the interest since the grant of letters of administration de bonis non to John Daley, the younger. But I do not think the sureties are- answerable for the hire of the negroes of the estate, after the revocation. For, at the revocation, they were only answerable for hire, as an incident of the possession of the adminis-tratrix to that time. When revoked, she ceased to hold as an administratrix for whom they were bound in time to come. They were responsible, as we have seen, that she would deliver the slaves and pay the hire then accrued, to whomsoever, by law, might be entitled. Her subsequent possession made her individually liable for hire.
The next question in the case is, how far can the surety impugn the decree of the Court of Equity? On this point of the case, it will be useful to review our various cases, and as I have the misfortune to differ on this question from a majority of the Court of Errors, I propose to give, as the means of better explaining my views, a synopsis of all our cases on the subject. It is curious to remark, in many of the cases, how little attention has been paid to the contract, (the administration bond) by the terms of which the admissability and effect of the decree are to be determined. The first case is the Ordinary of Orangeburgh vs. Phillpot and others, 1 Bay, 456. That case was on a bond, under the 22d and 23d Car. 2, 2 Stat. 523, but the condition was, in substance, the same of that prescribed, by the Act of 1789. In that case, it was held, that the general replication, that the administrator had not administered according to law, and that he had not rendered in an account of his administration to the Secretary of *524 State’s Office, was a sufficient answer to the plea of performance, and cast upon the defendants, the administrator and his sureties, the duty of shewing that the administrator had fully discharged his duty. Whether the rule of that case, simple as it is, would not have relieved us from much of the difficulty in which we have been, and still are, involved, it is not proper, perhaps, that I should undertake to determine, but I confess I should much prefer it to the unlimited re-examination of an administrator’s accounts, after they have been settled by a court of competent authority, and which has been allowed in this case.
The next case is the Ordinary of Kershaw vs. Bracey and Nourdin, 2 Bay, 542. The only thing necessary to be noted is, that there it was thought to be sufficient to charge the administrator and his sureties, to reply to the plea of performance, that he had not made a just and true inventory of the estate of the deceased, as, by law, he was bound to do.
In the case of the Ordinary of Edgefield vs. Martin et al. 1 Brev. 552, we, for the first time, find any allusion to the necessity of some preliminary proceedings in the Court of Ordinary, to an action at law on the bond. In that case it was held that “ an administrator was not bound, by the terms of the condition of the administration bond, to perform any of the acts therein specified, until he has been thereunto required by the Ordinary.” This, very properly, placed the liability where it really is to be found, in the contract. In the Ordinary vs. Williams and Parkman, and the Same vs. The Administrator and Administratrix of Gibson, 1 N. & McC. 587, it was held that until the administrator was cited before the Ordinary to account, an action could not be maintained on the bond. That case merely required, it must be noted, that a citation to account should have been issued and legally served; it did not look to the making up of the accounts as a measure of the administrator’s liability. The case of Simkins, Ordinary, vs. Powers, 2 N. & McC. 213, followed these cases, in which it was broadly laid down, that a decree of the Ordinary, establishing the balance for distribution, should precede the action. In 3 McC. 225, is the case of *525 the Ordinary vs. Caldwell, Moses and Robert Cowly, in which it was held, that the decree of the Ordinary, settling the accounts of the administrator and decreeing distribution, was at least prima facie evidence of the damages sustained on the condition of the bond. In Anderson, Ordinary, vs. Maddox, Guin, & Thomson, 3 McC. 237, the action was on a guardianship bond; it was held that the accounts must be made up and settled by some competent authority, before suit should be brought on the bond. Why 1 The answer in that case, and in every other, is, that the Court of Law has no jurisdiction of the auditing of the accounts of guardians, executors or administrators. In some cases they may be, and must be, examined at law, as on a plea of plene administravit generally, or praeter ; but between the executor, administrator or guardian, and legatee, distributee or ward, the Law Court has no jurisdiction of the accounts. In Shelton ads. Cureton, Ordinary, the question how far the decree of the Courty of Equity against administrators, was conclusive against sureties, was considered, and the court, after a very careful reading of the condition of the bond, held that the judge below was right in ruling it to be conclusive, except as to matters not coming within the bond, as for liabilities of the administrators in their individual capacities ; as to which, the court held that the sureties might look into the decree, and such matters as were not chargeable to the administrators as such, should be excluded from the recovery. That case placed the decree in Equity as equivalent to the decree of the Ordinary, on the ground, that Equity exercised the same jurisdiction as the Ordinary, with superior and controlling powers; and that after a decree in Equity, the Ordinary could not call the administrators to an account.
In the Ordinary vs. Robinson, Judge Nott said the decree of the Ordinary or the Court of Equity, “must be conclusive of what it purports to decide.” He said in another part of his decision, that if the administrator on citation failed “to appear and make his defence before the Ordinary, or to appeal from his decree, he is concluded by it, as a matter of evidence, in a court of law.” These *526 observations and rulings of a great Judge, must be understood in reference to the case before him. The 'question really was whether a recitation in the decree established the fact, that the administrator had been cited before the Ordinary, and the court held that the decree itself concluded the fact of the citation. In Joyner vs. Cooper, the principle established in Shelton ads. Cureton was recognized as the true rule, and in all other respects it was ruled that the decree was conclusive. The rule thus settled continued to be the acknowledged law until the Ordinary of Charleston vs. Condy, which was decided by my brethren Harper and Johnson, in ’34, in my absence from the court, in consequence of the severe domestic afflictions with which it pleased God to visit me. In that case, the administrator had been charged by a creditor in equity, and the debts set up as against his intestate’s estate; the surety contended he had the right to shew that they were the debts of the administrator, and not of his intestate. The circuit court refused to hear the evidence ; the objection also appeared in the pleadings in Equity. For the notes then set up were made by the administrator, after his intestate’s death, and in law were his individual debts. It was therefore perfectly right and proper to hold that the surety might look into the decree, and put his finger on the contracts, and say, I am not liable for them. But my brother Harper, in his able and elaborate judgment, placed the case upon the ground that the decree was only prima facie evidence ; overlooking, it seems to me, not only the previous decisions establishing a contrary rule, but also the condition of the bond. That case, so far as I know, has only been followed in a single instance, before the case now in hand, and that was in the Ordinary vs. Blakeney, Dudley, 27, in which the Judge below, (Richardson, J.) allowed the defendant the full benefit of the Equity rule of surcharging and falsifying, with one exception, to wit, that he refused to allow him to shew outstanding debts of the intestate. This exception was the only ground presented to the Court of Appeals, and they held the Judge below was right, which was as much as to say, the decree of the Ordinary concluded the defence. *527 For otherwise, outstanding debts ought to have diminished the fund for distribution.
I have thus fairly stated our past decisions, and I am now desirous of defining clearly my notions of the effect of the decree of the Ordinary or the Court of Equity against the sureties of an administrator. In the first place, neither the Ordinary vs. Condy, nor the Ordinary vs. Blakeney, have authoritatively touched the rule settled hy Shelton ads. Cureton. What is said about the decree in equity being only prima facie evidence, was not necessary to the decision of the Ordinary vs. Condy; it was merely the obiter of one of my brethren, with whom I have long been associated, and the value of whose opinions I have as much reason to know, and do as highly appreciate, as any other man. Still they are not law, except so far as necessary to the decision of the case. In Blakeney’s case, the question decided militates against the rule. In the second place, the Court of Law has no general jurisdiction over administrators’s accounts ; it is only when they are incidentally put in issue, that it feels itself called on to review them. If the case of the Ordinary vs. Phillpot and others had continued as the rule, it would have been necessary, in every action on an administration bond, to have examined the accounts ; but when that rule was repudiated, and the decree of the Ordinary or the Court of Equity made evidence of the quantum of damages sustained by the plaintiff, it was no longer necessary to do so. For the Court of Law, in adopting that rule, placed it upon the ground, that it had no jurisdiction over the administrators’s accounts, and its very organization rendered it incompetent to satisfactorily perform the duty of their examination. In the third place I think, when we look at the condition of the administration bond, we are obliged to adhere to the rule in Shelton’s case. The words are “and all the rest of the said goods, chattels and credits, which shall be found remaining upon the accounts of the said administration, the same being first allowed by the said court, (the Ordinary, or as has been decided, the Court of Equity,) shall deliver and pay unto such persons respectively as are entitled to the same by law.” Now according *528 to these words, the defendant has agreed, and bound himself, that his principal shall deliver and pay whatever the decree of the court may establish, as remaining on the foot of his administration. Now, I apprehend, whenever a party agrees that any judgment shall be evidence against him, it is conclusive, so far as he agrees it is to operate. He has the right to see it is according to, and no farther than, his contract. This is what is ruled in Shelton’s case. According to the defendant’s words, the administratrix “shall deliver and pay the goods, chattels and credits which shall be found remaining upon the accounts of the administration, the same being first allowed by the said court.” The court, in the place of' the Ordinary, has ascertained what goods, chattels and credits do remain ; and how can the surety question that, except by shewing from the decree, that she was charged with matters, such as the hire after revocation, with which she was not chargeable as administratrix 1 I confess I do not entertain a doubt that he can only go as far as Shelton’s case allows. There is only one other view which I desire to present; it is that in a joint action against the administrators and their sureties, the decree must be necessarily conclusive against the administrators, and yet if it be only prima facie evidence against the sureties, two rules of evidence must prevail, and two verdicts may be given in the same case. But if the rule of Shelton ads. Cureton should prevail, then there will be uniformity as to the rule against all parties to the case. For neither the administrators nor the sureties are bou nd in a suit on the bond for any matter not chargeable to the administration.
Wardlaw, J. concurred.